# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
    **Plaintiff,**

  v.                                                **Case No. 10-CR-12**

**MICHAEL RAMER**
    **Defendant.**

## SENTENCING MEMORANDUM

The government charged defendant Michael Ramer with wire fraud arising out of a scheme to defraud investors he devised and executed with his co-defendant, Travis Luedke. The defendants promised investors high rates of return "via the use of properly, and specially structured holding companies, and possibly other enhancement vehicles via fiduciary holding companies." The defendants actually used the money – more than $1,000,000 – for personal expenses, including those related to Ramer's unsuccessful attempt to operate a gold mine in Mexico. The investors never received anything.

Luedke pleaded guilty and agreed to cooperate with the government, testifying against Ramer at a court trial. I found Ramer guilty, ordered a pre-sentence report ("PSR"), and set the case for sentencing.

In imposing sentence, the district court follows a two-step procedure. E.g., United States v. Boroczk, 705 F.3d 616, 622 (7th Cir. 2013). First, the court must calculate the defendant's sentencing range under the advisory guidelines. Id. Second, the court must hear the arguments of the parties and then impose sentence based on all of the factors set forth in 18 U.S.C. § 3553(a). Id.

## I. GUIDELINES

Ramer's PSR calculated a base offense level of 7, U.S.S.G. § 2B1.1(a)(1), then added 16 levels based on a loss amount of $1,087,500, § 2B1.1(b)(1)(I), and 2 levels because the offense involved ten victims, § 2B1.1(b)(2)(A)(i). Ramer filed no objections but at sentencing argued that one of the listed victims – "S.J." – was not actually part of this scheme. Despite the defense's failure to timely raise the issue, which counsel indicated Ramer had just brought to her attention, I agreed to consider it. The government in turn agreed that, rather than conducting a contested hearing on the issue, I could disregard S.J. for purposes of the guidelines. Deducting the loss allegedly suffered by S.J. – $10,000 – did not alter the enhancement under § 2B1.1(b)(1)(I) (covering losses exceeding $1,000,000), but it did reduce the number of victims from ten to nine, eliminating the enhancement under § 2B1.1(b)(2)(A).[1] The parties thus agreed to a guideline range of 51-63 months.[2]

## II. SECTION 3553(a)

### A. Sentencing Factors

Section 3553(a) directs the district court to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

---

[1] In order to ensure that S.J.'s rights as a potential victim were respected, I held open the issue of restitution for 90 days. See 18 U.S.C. § 3664(d)(5). Later in this decision I establish a schedule for the parties' submissions on this issue.

[2] In its sentencing memorandum, the government indicated that guideline enhancements for abuse of trust, U.S.S.G. § 3B1.3, and obstruction of justice, U.S.S.G. § 3C1.1, arguably applied. However, the government agreed that I could consider those issues in imposing sentence under § 3553(a).

2

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the . . . sentencing range established . . . by the Sentencing Commission[;]
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission[;]
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The court must, after considering these factors, impose a sentence that is sufficient but not greater than necessary to comply with the purposes set forth in § 3553(a)(2). Id. While the guideline serve as a starting point in making this determination, Gall v. United States, 552 U.S. 38, 49 (2007); United States v. Schmitz, 717 F.3d 536, 541 (7th Cir. 2013), the district court may not presume that a guideline sentence is the correct one, Nelson v. United States, 555 U.S. 350, 352 (2009). Rather, the court must make an individualized assessment based on all of the § 3553(a) factors, United States v. Hodge, 729 F.3d 717, 721 (7th Cir. 2013), of which the guidelines are but one, United States v. Carter, 530 F.3d 565, 578 (7th Cir. 2008).

In the present case, Ramer requested a sentence of probation, while the government advocated a prison term of five years. After considering their arguments and the § 3553(a) factors, I found a prison term of 42 months sufficient but not greater than necessary.

3

**B.    Analysis**

   **1.    The Offense**

In 2004, the defendants began promoting investment programs under the names "Exchange Growth League" ("EGL") and "Western Corporate Management" ("WCM"). Luedke recruited a number of individuals to invest, telling them that they were investing in a variety of programs, including hedge funds, foreign currency, and real estate, and promising large rates of return. After signing contracts and other documents the defendants prepared, which contained payment terms referring to "international banking days" and choice of law provisions referring to the "Isle of Man" and the "Principality of Sealand," the investors wired the money to either the EGL account or the WCM account. Between mid-2004 and mid-2005, the defendants induced investors to wire more than $1,000,000.

The defendants made no legitimate attempt to invest the victims' money as promised. Instead, the majority of the money was converted to cash, which Luedke, defendant, and others spent on personal expenses. The investors lost everything. When the victims contacted the defendants, they received a number of false explanations and other excuses about what was going on. The defendants also tried to put the investors off by claiming that they had not satisfied some contractual obligation, like sending an 8.5 x 11 inch color copy of a driver's license or filling out a client information sheet.

The scheme caused losses of more than $1,000,000 to nine individual investors, and the PSR contained statements from several of the victims detailing the specific financial impact on them. One of the victims indicated that the defendants' fraud crippled his family financially, as he used the equity in his home to finance the investment; his wife, who used to stay home

4

and care for their children, was forced to return to work to make payments on the debt they incurred to invest with the defendants. Another victim described Ramer as a "big talker," who after it became apparent the invested money was not coming back attempted to make the victim feel stupid. A third victim indicated that both he and his mother invested with the defendants, mortgaging their homes for what was promised to be a "safe" investment; nothing was paid to either, and at the time she died the mother had no equity in her home.

**2.    The Defendant**

Defendant Ramer was sixty years old, with a prior record for harassment and resisting arrest in 1981, carrying a concealed weapon in 1984, and failure to present license in 2003, for which he was on probation when he commenced the instant scheme. In the 2003 case, following a traffic stop Ramer presented a "United Nations Operator's License and Permit," telling the officer that this was a proper form of identification, that the officer did not know the law, and that this was a good way for the officer to get into serious trouble. After he was taken into custody because the officers could not identify him, Ramer told the officers they would not get his fingerprints, they would have to break his fingers, and then they would have a civil lawsuit on their hands.

The PSR reported that Ramer was estranged from his family. He had no contact with his parents in over thirty years. He also reported very limited contact with his siblings. On the other hand, he had been married since 1982 and seemed to have a good relationship with his wife. She spoke approvingly of him at sentencing. Ramer told the PSR writer that he did not have contact with his family because they did not respond well to his marriage.

The PSR reported a previous marriage from 1974 to 1979, which produced two children, ages thirty-seven and thirty-six. Ramer had not seen his children in over thirty years. He told

5

the PSR writer that his divorce case was sabotaged because his lawyer was partners with his wife's lawyer. After his wife obtained custody of their children, she would call the police when he visited. He stated that his ex-wife lived with her mother, a Scientologist; the county Sheriff was also a Scientologist, and he would hit Ramer with a club when Ramer visited his children.

The PSR indicated that Ramer suffered from multiple health problems, including chest pain, hypertension, atrial fibrillation, diabetes, neuropathic pain, sleep problems, breathing difficulty, and a bulging disk, for which he took numerous medications. He did not appear to have any substance abuse problems. He graduated high school, with some college and a work record he characterized as self-employment in the consulting business since the early 1990's. None of his reported employment could be verified. He did serve in the air force from July 14, 1971 to September 26, 1972, receiving an honorable discharge.

### 3. The Sentence

The guidelines called for a term of 51-63 months, and I agreed that a period of imprisonment was needed to satisfy the purposes of sentencing in this case. The probationary sentence Ramer proposed would have seriously depreciated the seriousness of this offense, which caused substantial losses to the victims and involved brazen tactics. The defendants held themselves out as experienced investment advisors, which was plainly untrue and an abuse of trust. Cf. U.S.S.G. § 3B1.3 cmt. n.3 ("For example, the enhancement [for abuse of trust] applies in the case of a defendant who . . . perpetrates a financial fraud by leading an investor to believe the defendant is a legitimate investment broker[.]"). A crime need not involve violence to be serious enough to require confinement. The impact on the victims, who were not large institutional investors or wealthy people, was substantial, as indicated in their statements. I acknowledged that Ramer did not get rich from this scheme or spend the money

6

on extravagancies, but he did live off the proceeds of the offense while attempting to operate the gold mine in Mexico. Ramer stated that he got into this with the highest of hopes and the best of intentions, and I accepted that he was hoping to make money if the gold mine worked out, some of which he may have shared with the investors, but he set this up in such a way that the investors really had no chance. Having listened to the evidence and sentenced the co-defendant, Luedke, it was my impression that Ramer was the more culpable of the two. Luedke had the contacts with prospective investors, but Ramer, the evidence suggested, was the real salesman; he directed Luedke in some respects, particularly in responding to investors; and he came up with most of the outlandish documents used in the scheme. It also appeared that Ramer reaped most of the benefits. The defense memo characterized Ramer as brilliant and imaginative, but there was a less charitable interpretation. I could not conclude that just punishment would be satisfied by the mere fact that Ramer had to travel across the country to this court to defend himself.

According to Sentencing Commission research and other studies, persons of Ramer's age, especially those with limited records, re-offend at low levels, suggesting that a lengthy prison term would not be needed to satisfy the purposes of deterrence and public protection. However, Ramer was not a first time offender. His record was not substantial, but he did have three prior convictions, and he was on probation at the time he commenced this offense, which suggested that community supervision might not be sufficient in his case. Ramer argued that I should give the 2003 case little weight, but in reading the description set forth in the PSR I saw some of the same kind of grandiosity involved in the instant offense. I was also required to balance against the generalities about older, white collar offenders, the specific facts here – Ramer was in his fifties when he committed this offense, which stretched on for a substantial

7

period of time. As the government noted, this was not a discrete and limited act of criminal conduct. Ramer also had no real, verifiable work history following his service in the air force forty years ago.

Ramer had medical issues, which would make prison harder for him than a more able bodied person, but they could be addressed by the Bureau of Prisons ("BOP"), as indicated in a letter from the Regional Medical Director attached to the government's memo.[3] I recommended placement at a medical center to ensure that his medical needs were met. I saw no other correctional treatment needs. Payment of restitution to the victims was an issue, and Ramer expressed a desire to do so during his allocution. Obviously, a defendant serving his sentence in the community can better pay than one imprisoned, but that reality could not overcome the need for confinement to reflect the seriousness of the offense and promote respect for the law. In any event, Ramer made no effort to repay the victims during the several years this case was pending.

Ramer argued that he compared favorably with the co-defendant, Luedke, whom I sentenced to a little over two years in prison. I agreed that the two defendants were different, but the distinction went the other way. Luedke pleaded guilty and cooperated with the government, which supported a lower sentence for him. See, e.g., United States v. Stevenson, 680 F.3d 854, 858-59 (7th Cir. 2012). Ramer also provided incredible testimony at trial, as the government pointed out in its brief. These facts more than made up for any differences in their records. In any event, Luedke also fell in criminal history category II. Finally, I found Ramer

---

[3] In arguing against the government's recommendation, the defense suggested that Ramer might not have five years of life left. However, the defense presented no evidence in support of a claim that Ramer would not survive a prison term of five years or less. Cf. United States v. Wurzinger, 467 F.3d 649, 652 (7th Cir. 2006).

8

more culpable in the commission of the crime.

Under all the circumstances, I found a sentence of 42 months sufficient but not greater than necessary to satisfy the purposes of sentencing. This sentence accounted for Ramer's health problems and the other, few mitigating circumstances, including his compliance with pre-trial release conditions for a significant period of time, while still providing sufficient punishment and deterrence.

### III. CONCLUSION

For the foregoing reasons and those stated on the record, I committed defendant Ramer to the custody of the Bureau of Prisons for 42 months. I recommended placement at the medical center in Rochester to ensure that his medical needs were addressed. Based on his financial situation and the restitution, I determined that he lacked the ability to pay a fine and so waived the fine. I required him to make restitution in the amount of $1,077,500, joint and several with Luedke, to the victims listed in ¶ 80 of the PSR (aside from S.J.). Upon release from prison, I required him to serve 3 years of supervised release; I selected the maximum supervision term to ensure monitoring and to try to facilitate payment of restitution.

Regarding the issue of restitution to S.J., the following schedule shall apply:

On or before **December 9, 2013**, the government shall file a memorandum explaining why S.J. qualifies as a victim of the offense under 18 U.S.C. § 3663A(a)(2) and setting forth the basis for a restitution award to S.J.; on or before **December 23, 2013**, defendant Ramer shall file a response to the government's submission; and on or before **December 30, 2013**, the government may file a reply. Unless I determine that an evidentiary hearing is necessary to resolve this issue, I will issue a written decision and, as appropriate, an amended judgment

9

setting forth any award to S.J.

Dated at Milwaukee, Wisconsin, this 25th day of November, 2013.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge